UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | Civil Action No. |
| v. | **JURY TRIAL DEMANDED** |
| JAMES K. COUTURE, Defendant. | |

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission") alleges the following against the Defendant James K. Couture, ("Couture" or "the Defendant"):

## SUMMARY OF THE ACTION

1.     This is a securities fraud enforcement action against Couture, a former investment adviser representative and broker-dealer registered representative.  As an investment adviser, Couture owed his clients a fiduciary duty to not place his own interest ahead of his clients' interest, to act with utmost good faith, to disclose material conflicts of financial interest, and to use reasonable care to avoid misleading them.  From approximately 2009 through December 2019, however, Couture violated this fiduciary duty by engaging in a deceptive scheme to misappropriate approximately $2.9 million from his advisory clients.

2.     Couture carried out his scheme by fraudulently prompting his clients to sell portions of their securities holdings in order to fund large money transfers to an entity that, unbeknownst to his clients, Couture owned and controlled.  For each transaction, Couture obtained client authorization under a false pretense that the proceeds would be reinvested for the clients' financial benefit.  In reality, Couture's intent and purpose in arranging these securities

transactions was to divert the sale proceeds for his own use and benefit.  And, once Couture used the fraudulently obtained authorizations to secure the sale of client securities and transfer of the proceeds to his exclusive control, Couture proceeded to spend the money for his own benefit.

3.      In furtherance of his scheme, Couture lulled clients into believing that their sale proceeds had been actually reinvested by providing them with fabricated account statements and account holding reviews, which he provided to his clients through electronic mail or by U.S. Mail.  The fabricated documents reflected securities transactions that never happened, current investments that did not exist, and earnings that the clients never received, all to create the false appearance that Couture had reinvested his clients' money.

4.      Further, when clients requested withdrawals, Couture fraudulently took assets from other advisory clients to cover those withdrawals.  To hide this later misappropriation, Couture transferred client money through a web of third-party administrator accounts to disguise that he was misappropriating money from one client to replace funds he had previously stolen from another.

5.      As a result of the conduct alleged herein, the Defendant violated, and unless restrained and enjoined will continue to violate Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder; and Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 ("Advisers Act").

6.      The Commission seeks a permanent injunction against the Defendant, enjoining him from engaging in the transactions, practices, and courses of business alleged in this Complaint; disgorgement of the defendant's ill-gotten gains pursuant to Section 21(d)(7) of the Exchange Act 15 U.S.C. § 78u(d)(7)], plus pre-judgment interest; civil penalties pursuant to

Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)]; and such other relief as the Court may deem appropriate.

## JURISDICTION AND VENUE

7.      The Court has jurisdiction over this action pursuant to Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), 78aa], and Sections 209(d), 209(e) and 214 of the Advisers Act [15 U.S.C. §§ 80b-9(d), 80b-9(e), 80b-14].

8.      Venue lies in this District pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa], Section 214 of the Advisers Act [15 U.S.C. § 80b-14] and 28 U.S.C. § 1391(d) because, among other things, certain acts or transactions constituting the violations of the federal securities laws detailed herein occurred in this district.  Also, at all relevant times, Couture's principal place of business and Couture's residence were in Massachusetts.

9.      In connection with the transactions, acts, practices, and courses of business described in this Complaint, the Defendant directly and indirectly made use of the mails or the means and instruments of transportation or communication in interstate commerce.

10.      The Defendant's conduct involved fraud, deceit, or deliberate or reckless disregard of regulatory requirements, and resulted in substantial loss, or significant risk of substantial loss, to other persons.

## THE DEFENDANT

11.      **James K. Couture ("Couture")**, age 42, resides in Sutton, Massachusetts.  He was the founder and owner of The Private Wealth Management Group, LLC ("PWMG"), a Massachusetts limited liability company.  Couture created PWMG in 2010 to provide investment advisory services and sell insurance products.  PWMG had its main office in Worcester, with a

second office in Springfield, Massachusetts and it employed approximately eight people.  It is

not registered with the Commission or any state regulator in any capacity.

12.     From February 2009 to June 2020, Couture was an investment adviser

representative and broker-dealer registered representative of LPL Financial LLC ("LPL"), a firm

that is registered with the Commission as an investment adviser and broker-dealer.  As of

December 2019, Couture had approximately $150 million in assets under management for

investment advisory clients, who included both individuals and organizations.

13.     On June 17, 2020, LPL discharged Couture.  In its Form U5 filing reflecting its

reason for discharging Couture, LPL stated that Couture had: "Altered identifying information,

account balances and distributions in customer account statement; maintained comingled

customer funds; [and] use[d] [] an unapproved email address."

14.     Couture also owns and operates CWM Retirement Plan Services, LLC, a third-

party administrator ("TPA") business, which handles the day-to-day administration of certain

employee benefit and retirement plans.

15.     In September 2009, Couture formed Legacy Financial Group, LLC as a New

Hampshire limited liability company.  The stated purpose of the company was to "purchase, own

and hold ownership interests in other companies."  In August 2013, the New Hampshire

Department of State administratively dissolved the company.

## FACTUAL ALLEGATIONS

16.     In February 2009 and continuing until June 2020, Couture was an investment

adviser, meaning he was in the business of advising clients about the value of securities and the

advisability of investing in securities.  Couture received compensation for his investment

advisory services in a variety of ways, including fees charged on clients' assets under

management, and, as detailed further below, by misappropriating his clients' money for personal use.  As an investment adviser, Couture owed his clients an affirmative duty of utmost good faith, a duty to disclose material conflicts of interest, and a duty to employ reasonable care to avoid misleading them.

17.     Couture routinely advised his brokerage customers and investment advisory clients to invest some or all of their funds in sub-accounts managed by a third-party sub-adviser, (the "Sub-Adviser") whose services LPL permitted on its investment platform.  Under the terms of the agreements between the Sub-Adviser, the account owner (Couture's brokerage customer or investment advisory client), and Couture (the "Financial Advisor"), Couture's client gave him "full authorization," which meant the authority to instruct the Sub-Adviser "[t]o make changes with regard to the management of the Account, including changes to the Investment Solution, the Strategy, including the employment of a hedging strategy, and any restrictions related to the Account and to harvest investment gains or losses from the Account."  Couture also had authorization under the agreements to make certain types of withdrawals from the account.  The agreements provided that Couture would receive an annual "Financial Advisor Fee" for the account, based on the assets under management in the account.

18.     After depositing clients' funds and investing them in securities through Sub-Adviser accounts, Couture began a deceptive scheme in which he fraudulently prompted his Sub-Adviser clients to sell portions of their securities holdings in order to fund large money transfers to an entity outside the Sub-Adviser called "Legacy Financial Group," also sometimes referred to as "Legacy Financial."  Unbeknownst to his clients, Couture had formed Legacy Financial Group in 2009 and exercised ownership and control over the entity and its bank accounts.  It had

no affiliation with LPL or the Sub-Adviser.  Neither LPL, nor the Sub-Adviser had authorized Couture to use Legacy Financial Group as a third-party sub-adviser.

19.     Couture lured clients to authorize the sale of securities from their Sub-Adviser accounts and to transfer those sale proceeds to Legacy Financial Group under a false pretense that the proceeds would be re-invested in securities for their financial benefit.  Unbeknownst to these clients, Couture had no intention of reinvesting the proceeds in securities and, instead, intended on spending the money for his own benefit.  Couture set up each fraudulent client authorization to direct the Sub-Adviser to send checks to his business or personal address, either by mail or Federal Express.  Couture then deposited the funds in a Legacy Financial Group bank account and used the client funds for his own purposes, including paying personal and business expenses.

20.     When clients eventually requested return of their investment assets, Couture replaced their missing funds by misappropriating assets from other clients.  Couture did not disclose his use of client funds to make payments to earlier defrauded clients, nor did he request permission from any clients to use their funds for that purpose.

a.   **Clients A and B**

21.     Clients A and B, a married couple residing in Nashua, New Hampshire, were brokerage customers of Couture when he joined LPL in 2009.  In or about April, 2009, Couture advised Clients A and B to open investment accounts at the Sub-Adviser.  In opening accounts with the Sub-Adviser and entering into an agreement between the Sub-Adviser, Couture, and Clients A and B, Clients A and B gave Couture "full authorization" to make changes with regard to the management of their accounts, including changes to investment strategy and any restrictions related to the accounts.  The agreement between the Sub-Adviser, Couture, and

Clients A and B also provided that Couture would receive an annual financial advisor fee calculated as a percentage of assets invested through Clients A and B's Sub-Adviser accounts. Between April and June 2009, Clients A and B, at Couture's prompting, transferred approximately $1.2 million of their investment assets to their Sub-Adviser accounts. For the time Clients A and B's assets were invested through their Sub-Adviser accounts, Couture received his management fee from Clients A and B's accounts.

22.     In or about September 2009 and continuing through February 2015, Couture repeatedly prompted Clients A and B to sell portions of their securities holdings in their Sub-Adviser accounts in order to fund money transfers to Legacy Financial Group. Couture lured Clients A and B to authorize the sale of securities and subsequent money transfers under a false pretense that the sale proceeds would be reinvested for their financial benefit. In fact, unbeknownst to Client A and B, Couture intended to, and did, use these funds for the purpose of paying Couture's own personal and business expenses.

23.     At Couture's direction, Clients A and B signed withdrawal request authorizations, which Couture had pre-filled, directing the Sub-Adviser to issue checks on the following dates in the following amounts:

- September 14, 2009 from a Sub-Adviser account in the amount of $300,000;

- September 12, 2012 from a Sub-Adviser account in the amount of $350,000;

- October 16, 2013 from a Sub-Adviser account in the amount of $50,000;

To fulfill each of these withdrawal requests, the Sub-Adviser was required to sell several of Client A and B's securities holdings in order for their accounts to have the necessary funds to issue the requested checks.

24.    At the time Couture used the fraudulently obtained authorizations Couture had no intention of reinvesting the funds from the sale of Clients A and B's securities in the Sub-Adviser accounts.  After depositing the funds in Legacy Financial Group's bank account, Couture proceeded to spend all of that money.  Couture used a portion of this money to expand his business by purchasing a book of advisory clients from another investment adviser representative.  During an investigation into Couture's activities, the Commission subpoenaed Couture to give testimony under oath.  During this testimony, the Commission staff asked Couture whether he used funds taken from Clients A and B for his own personal use and benefit. Couture declined to answer by invoking his Fifth Amendment privilege against self-incrimination.

25.    On or about May 18, 2016, Client A informed Couture that he was having difficulty logging into his LPL online access to see account holdings.  Couture initially made excuses, but eventually assisted Client A to be able to log in.  After this assistance, however, Client A observed that many of his accounts were missing from the LPL database.  Client A found this situation to be unsettling and directed Couture to move the assets held outside of LPL back to his LPL accounts.

26.    Over the next several weeks, Couture emailed Client A with a series of updates in which he represented that he was processing a "tax neutral" sale of Clients A and B's securities holdings to return their funds to LPL.  In reality, with respect to the funds previously transferred to Legacy Financial Group, Couture knew that he had never purchased any securities with that money, but had, instead, spent it for his own benefit.

27.    On June 17, 2016, Couture told Client A that soon two checks would arrive. Couture represented that the checks represented funds from the sale of Clients A and B's

8

securities in accounts held outside of LPL.  In truth, however, as Couture well knew, Legacy

Financial Group did not hold any securities for the benefit of Clients A and B.  Indeed, Couture

could not return any of Clients A and B's money from Legacy Financial because he had spent it.

Instead, Couture funded the issuance of these two checks by fraudulently misappropriating funds

from another client, Client D.

28.     In misappropriating Client D's money, Couture took steps to disguise that he was

stealing from one client to pay another.  Couture used his TPA business, CWM Retirement Plan

Services, to create a fake employee benefit plan account through which he could filter the

payments from Client D and give a false appearance that these payments to Client A were part of

some kind of employment relationship.  In reality, there was no employment relationship

between these two clients.  They did not even know each other.

29.     In conducting CWM's business as a third-party administrator of retirement and

employee benefit plans, Couture routinely created accounts at a distribution trust company

("Trust Company") for the purpose of managing plan assets, including processing payments to

plan participants.

30.     On June 16, 2016, Couture created a benefit plan account at Trust Company for

Client D as a "sole proprietor" and identified her plan type as a "Stock Bonus Plan."  Couture

further designated Client A as a participant of the Stock Bonus Plan who would receive "express

distribution payments."  The stock bonus plan was a fiction.  Client D did not have a sole

proprietorship in need of such a plan.

31.     Couture then cashed in two of Client D's variable annuities, which are securities

subject to the federal securities laws, without Client D's knowledge and consent, one worth

approximately $558,000 and the other worth approximately $362,000.  Couture caused the total

proceeds of approximately $920,000 to be deposited in the Trust Company account for Client D's non-existent stock bonus plan.

32.     On June 24, 2016, the proceeds from Couture's unauthorized sale of Client D's variable annuities arrived in the Trust Company account.  Couture then caused the Trust Company to issue a check payable to LPL for of the benefit of Client A in the amount of approximately $557,000.  The payment instructions characterized the payment as a "Rollover to New Employer," and directed delivery of the payment check to LPL at Couture's business address in Worcester, Massachusetts.

33.     On June 29, 2016, Couture again caused the Trust Company to issue a check payable to LPL for the benefit of Client A, this time in the amount of approximately $362,000. The payment instructions similarly characterized the payment as a "Rollover to New Employee," but this time directed delivery of the check to Couture's second home in South Dennis, Massachusetts.

34.     Couture caused these two checks to be deposited in the LPL account of Clients A and B.  He then used these fraudulently obtained funds to purchase securities in Client A and B's LPL account.  Shortly thereafter, Clients A and B decided to change investment advisers and transferred their assets from Couture to another investment adviser over the next few years.

### b.  Client C

35.     Client C, residing in West Palm Beach, Florida, was introduced to Couture through family members who were already clients of Couture, including Client C's mother (Client G, described further below).  In or about December 2010, Client C spoke by telephone with Couture to discuss her investment goals.  Client C told Couture she wanted him to manage her investment assets so that she could retire on the funds she possessed.  Couture agreed to

manage her financial assets such that she could live off them until she was 80 years old.
Following this representation, Client C hired Couture to advise her on investing and to manage
her investment assets.  Beginning in December 2010 and continuing thereafter, Client C
transferred over approximately $1,000,000 to investment accounts managed by Couture.

36.     In or about January 2011, on advice from Couture, Client C opened investment
accounts at the Sub-Adviser with funds from her LPL Investment account.  In opening accounts
with the Sub-Adviser, Client C gave Couture "full authorization" to make changes with regard to
the management of the accounts, including changes to investment strategy and any restrictions
related to the account.  Under the account agreement, Couture would, and did, receive an annual
financial advisor fee calculated as a percentage of assets invested through Client C's Sub-
Adviser accounts.

37.     On January 6, 2011, Client C signed a standing instruction authorization for funds
to be moved from her LPL accounts to her newly created accounts at the Sub-Adviser.
Thereafter, in February 2011 approximately $362,000 was transferred from Client C's LPL
account into her Sub-Adviser accounts.  In March 2012, Client C sold her home and wired the
sale proceeds of approximately $428,000 to her Sub-Adviser accounts.

38.     On or about December 13, 2012, Couture prompted Client C to sell a portion of
the securities held in her Sub-Adviser accounts in order to fund a large money transfer of
$250,000 to Legacy Financial Group.  Couture lured Client C to authorize this sale of securities
and subsequent money transfer under a false pretense that the sale proceeds would be reinvested
for her financial benefit.  In fact, unbeknownst to Client C, Couture intended to, and did, use the
funds for the purpose of paying Couture's own personal and business expenses.

39.     At Couture's direction, Client C signed a withdrawal request authorization, which Couture had pre-filled, directing that the Sub-Adviser issue a check in the amount of $250,000 payable to Legacy Financial and deliver it to Couture's business address in Worcester, Massachusetts.  To fulfill this withdrawal request, the Sub-Adviser was required to sell several of Client C's securities holdings in order for her accounts to have the necessary funds to issue the requested check.

40.     Couture had no intention of reinvesting the funds from the sale of Client C's securities in the Sub-Adviser accounts.  Once Couture received the check by mail, he deposited it in the Legacy Financial Group bank account and then proceeded to spend the funds.  During investigation testimony, Commission Staff asked Couture whether he used these funds for his own personal use and benefit.  Couture declined to answer by invoking his Fifth Amendment privilege against self-incrimination.

41.     To conceal his theft of Client C's funds, Couture provided Client C with fabricated account statements.  These fabricated statements reported non-existent securities holdings labeled as "Legacy Financial," "LFG PE Fund IV," and/or "LFG S&P."  Couture used these fake holdings reports to mislead Client C into believing that the funds Couture transferred to Legacy Financial had been reinvested in securities and were appreciating in value.

42.     Couture also cut and pasted Client C's account identification on account statements of other clients, and then gave Client C the doctored statements to falsely represent the holdings as hers.  For example, in October 2019, Couture supplied Client C with the LPL account statement of another client that had an account balance over $600,000.  To mislead Client C, Couture removed the owner's name, address and account number from the account statement and replaced them with Client C's information.  Couture also added line items from

Client C's actual accounts to the account statement.  In reality, Client C's actual accounts had been depleted to approximately $20.

43.     In October 2019, Couture gave Client C a retirement income analysis representing that Client C held 25,000 units of a security named "LFG S&P" or "S&P 500 Idx," with a current market value of over $650,000.  This holding was a fiction.  In October 2019, Client C did not hold any such shares in a fund named "LFG S&P" or "S&P 500 Idx."

44.     Late in 2019, Client C decided to change her investment adviser and move her accounts from LPL and Couture to a different firm and adviser representative.  Client C signed an authorization to transfer her securities in-kind from LPL to her new advisory firm.  When Client C's new adviser did not receive the expected transfer, he called Couture to find out the location of Client C's securities holdings.  Couture told Client C's new adviser that Couture had sold Client C's securities holdings and had instead transferred the sales proceeds.  In reality, there were no securities to be sold.  Instead, Couture stole money from other clients in order to fund wire transfers to Client C's account at the new adviser.

45.     In December 2019 and January 2020, Couture arranged to transfer funds to Client C's account at her new adviser and Client' C's bank account by arranging for three wire transfers totaling over $650,000.  While the total amount transferred to Client C was approximately consistent with the fraudulent account statements and analyses Couture had recently provided to Client C, the sources of these payments were other clients' money, not any securities actually owned by Client C.

46.     Couture funded two of the three transfers, totaling approximately $270,000, by misappropriating funds from Client E (who is described in further detail below).

47.     Couture funded the third wire transfer, of approximately $385,000, by misappropriating the funds from Client F (who is described in further detail below).

      **c.   Client D**

48.     As of September 2011, Couture had served for a number of years as an investment adviser for Client D, a widow residing in North Falmouth, Massachusetts.  Under the applicable advisory agreements with Client D, Couture received a recurring management fee of a certain percentage of Client D's assets under management for his investment advisory services.

49.     As of the end of September 2011, Client D had approximately $2.2 million in assets under Couture's investment management, including approximately $1.6 million in accounts held by or reported through LPL and approximately $600,000 held in accounts by the Sub-Adviser.  The assets held were mostly securities, including stocks, mutual funds, and variable annuities.

50.     Between October 2011 and January 2012, Couture repeatedly prompted Client D to sell portions of her securities holdings in her Sub-Adviser accounts in order to fund money transfers that totaled approximately $300,000 to Legacy Financial Group.  Couture lured Client D to authorize these sale of securities and subsequent money transfers under a false pretense that the sale proceeds would be reinvested for her financial benefit.    In fact, unbeknownst to Client D, Couture intended to, and did, use these funds for the purpose of paying Couture's own personal and business expenses.

51.     With the fraudulently obtained authorizations, Couture directed withdrawals from Client D's accounts at the Sub-Adviser to be sent to a bank account in the name of Legacy Financial Group, which he controlled exclusively.  Couture directed these withdrawals on the following dates:

- October 14, 2011 from a Sub-Adviser account in the amount of $100,000;

- October 18, 2011 from a Sub-Adviser account in the amount of $100,000;

- January 26, 2012 from a Sub-Adviser account in the amount of $50,000; and

- January 30, 2012 from a Sub-Adviser account in the amount of $50,000.

For each of these withdrawals, Couture's submission of the fraudulently obtained authorization required the Sub-Adviser to sell securities holdings to generate sufficient funds to pay the withdrawal amount.

52.     Couture had no intention of reinvesting Client D's funds in securities.  Couture deposited the funds in the Legacy Financial Group bank account and proceeded to spend the money.  During investigation testimony, the Commission asked Couture whether he used these funds for his own personal use and benefit.  He declined to answer by invoking his Fifth Amendment privilege against self-incrimination.

53.     Further, in June 2016, as described in paragraphs 27 through 34 above, Couture misappropriated approximately $900,000 of Client D's funds to cover up earlier misappropriations from Clients A and B.

54.     In total, Couture misappropriated approximately $1,200,000 from Client D.  To date, Couture has not returned or replaced any of the funds taken from Client D.

55.     To keep Client D from discovering the misappropriation, Couture provided Client D with fabricated account statements that reported securities holdings that did not exist in her account.  For example, in one instance, Couture presented Client D with an account statement that had been edited to include account holdings from another client account, creating the false appearance that these holdings were part of Client D's account.  This fabricated account

statement purported to show Client D that she had held approximately $2.6 million in assets.  In reality, Client D's account total was closer to $300,000.

### d.  Client E

56.     Between March 2014 and August 2015, Client E, residing in Cambridge, Massachusetts, opened three advisory accounts with LPL to be managed by Couture.  By the end of 2015, Client E had placed approximately $2 million in these accounts for Couture to invest on his behalf.  Under the advisory account agreements, Couture received a recurring fee of a certain percentage of Client E's assets under management for his investment advisory services.

57.     As explained in paragraphs 45 through 47 above, in December 2019, Couture misappropriated $270,000 from Client E, taken in two wire transfers, to repay money that Couture had previously taken from Client C.

58.     In misappropriating Client E's money, Couture took steps to disguise that he was stealing from one client to pay another.  Specifically, Couture filtered Client E's money through a legitimate, preexisting profit sharing plan in Client E's name in order to create a false and misleading appearance that Client E was transferring this money to Client C as part of an employer-employee relationship.  In reality, there was no employment relationship between these two clients.

59.     Prior to 2019, Couture had set up a profit sharing plan account at LPL and the Trust Company for Client E.  The LPL Account had one participant, Client E.   Client C was not a participant of this plan and has never been an employee of Client E.  Client E and Client C did not even know each other.

60.     In the first week of December 2019, Couture transferred $307,000 from Client E's profit sharing plan at LPL to the preexisting profit sharing plan account at the Trust Company.

16

To fund the transfer of money from Client E's LPL accounts, Couture liquidated some of Client E's securities holdings.

61.    On December 11, 2019, Couture caused the Trust Company to wire approximately $259,000 from Client E's profit sharing plan account to an LPL account in Client C's name, fraudulently labeling the reason for the transfer as a distribution for "employee separation of service."

62.    On December 19, 2019, Couture transferred approximately $11,000 from Client E's Trust Company profit sharing plan account to a commercial bank account in Client C's name, again fraudulently labeling the reason for the transfer as a distribution for "employee separation of service."

63.    In total, Couture misappropriated at least $270,000 from Client E.  To date, Couture has not returned or replaced any of these funds.

### e.  Client F

64.    In March 2009, Client F, residing in Worcester, Massachusetts, opened two advisory accounts with LPL to be managed by Couture.  One of these accounts was a retirement plan account associated with Client F's employer, a small law firm with approximately six employees.

65.    From approximately March 2009 continuing through June 2020, Couture served as an investment adviser for Client F's retirement plan account.  As part of the advisory agreement for this account, Couture received a recurring management fee of a certain percentage of Client F's assets under management.  As of November 2019, the invested securities in Client F's retirement plan account totaled approximately $504,000.

66.     As explained in paragraphs 45 through 47 above, in December 2019, Couture misappropriated approximately $385,000 from Client F to repay money that Couture had previously taken from Client C.

67.     In misappropriating Client F's money, Couture took steps to disguise that he was stealing from one client to pay another.  Couture filtered Client F's money through a preexisting employee benefit plan account at Trust Company to create the false and misleading impression that the payment to Client C was a legitimate distribution of plan money to a plan participant.  In reality, Client C was never an employee of the benefit plan.   Client F and Client C did not even know each other.

68.     Prior to 2019, Couture had set up an account at the Trust Company for a profit sharing plan for Client F's employer, a 6-person law firm.  Client C has never been an employee of the law firm and has never been a participant in this plan.

69.     On December 6, 2019, Couture caused Client F's retirement plan account at LPL to transfer approximately $385,000 to the law firm profit sharing plan account at Trust Company. To fund the withdrawal of money from Client F's LPL account, Couture liquidated some of Client F's securities holdings.  On or about December 31, 2019, Couture caused the Trust Company to transfer the same approximate amount (less a small amount of tax withholding) from the law firm's profit sharing account to an account in Client C's name, fraudulently labeling the reason for the transfer as a "Rollover to New Employer" upon a "Plan Termination."

70.     To date, Couture has not returned or replaced any of these funds.

**f.    Client G**

71.     As of September 2013, Couture had served for several years as an investment adviser for Client G, residing in Palm Beach Gardens, Florida.  Under the applicable investment

18

adviser agreement, Couture received a recurring management fee of a certain percentage of Client G's assets under management for his investment advisory services.

72.     At the end of September 2013, Client G had approximately $800,000 in assets under Couture's investment management, including approximately $300,000 held in accounts held by or reported through LPL and approximately $500,000 held in accounts of the Sub-Adviser.  The assets held were mostly securities, including stocks and mutual funds.

73.     With regard to the Sub-Adviser accounts, Client G had given Couture "full authorization" to make changes with regard to the management of the accounts, including changes to investment strategy and any restrictions related to the account.  Under the agreement, Couture received compensation calculated as a percentage of assets invested through Client G's Sub-Adviser accounts.

74.     On October 16, 2013, Couture prompted Client G to sell a portion of the securities held in her Sub-Adviser account to fund a money transfer of $50,000 to Legacy Financial Group. Couture lured Client G to authorize this securities-funded money transfer under a false pretense that the sale proceeds would be reinvested for her financial benefit.  In fact, unbeknownst to Client G, Couture intended to, and did, use these funds for the purpose of paying Couture's own personal and business expenses.

75.     At Couture's direction, Client G signed a withdrawal request authorization, which Couture had pre-filled, directing that the Sub-Adviser issue a check in the amount of $50,000 payable Legacy Financial Group and to deliver it care of Couture at his PWMG address in Worcester, Massachusetts.  To fund this withdrawal request, the Sub-Adviser was required to sell securities holdings to generate sufficient funds to issue the $50,000 check.

76.     Couture had no intention of investing Client G's funds in securities.  Once Couture received the check, he deposited it in the Legacy Financial Group bank account and then proceeded to spend the money.  Couture used some of this money to expand his business by purchasing a book of advisory clients from another investment adviser representative.   During investigation testimony, the Commission Staff asked Couture whether he used these funds for his own personal use and benefit.  Couture declined to answer by invoking his Fifth Amendment privilege against self-incrimination.

77.     To date, Couture has not returned or replaced any of the funds taken from Client G.

## FIRST CLAIM FOR RELIEF

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

78.     The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 77 above as if set forth fully herein.

79.     By engaging in the conduct described above, the Defendant, directly or indirectly, acting intentionally, knowingly or recklessly, by the use of means or instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities:  (a) has employed or is employing devices, schemes or artifices to defraud; (b) has made or is making untrue statements of material fact or has omitted or is omitting to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) has engaged or is engaging in acts, practices or courses of business which operate as a fraud or deceit upon certain persons.

80.     The Defendant's conduct involved fraud, deceit, manipulation, and/or deliberate or reckless disregard of regulatory requirements and directly or indirectly resulted in substantial losses to other persons.

81.     As a result, the Defendant has violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF

### Violation of Sections 206(1) and 206(2) of the Advisers Act

82.     The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 77 above as if set forth fully herein.

83.     At all relevant times, Couture was an "investment adviser" within the meaning of Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80b-2(a)(11)].  Couture was in the business of providing investment advice concerning securities for compensation.  Couture was also an investment adviser with respect to his recommendations as an adviser representative of LPL.

84.     As set forth above, Couture misappropriated money from advisory clients through a scheme to defraud and through transactions, practices, and courses of business which operated as a fraud or deceit upon his advisory clients.

85.     The Defendant, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, acting intentionally, knowingly or recklessly:  (a) has employed or is employing devices, schemes, or artifices to defraud clients and/or potential clients; or (b) has engaged or is engaging in transactions, practices, or courses of business which operate as a fraud or deceit upon a client or prospective client.

86.     As a result, the Defendant has violated and, unless enjoined, will continue to violate Sections 206(1) and (2) of the Advisers Act [15 U.S.C. § 80b-6(1) & (2)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court:

A.     Enter a permanent injunction enjoining the Defendant from directly or indirectly engaging in the conduct described above, or in conduct of similar purport and effect, in violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] and Sections 206(1) and (2) of the Advisers Act [15 U.S.C. § 80b-6(1) & (2)];

B.     Require the Defendant to disgorge his ill-gotten gains, plus pre-judgment interest, with said monies to be distributed in accordance with a plan of distribution to be ordered by the Court;

C.     Require the Defendant to pay an appropriate civil monetary penalty pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)];

D.     Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court; and

E.     Grant such other and further relief as this Court may determine to be just and

necessary.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Commission demands a jury trial in this action of all issues so triable under the claims in this Complaint.

Respectfully submitted,

**SECURITIES AND EXCHANGE COMMISSION**

By its attorneys,

*//s//Richard M. Harper II*
Richard M. Harper II (Mass. Bar No. 634782)
   Senior Trial Counsel
Martin F. Healey  (Mass. Bar. No. 227550)
   Senior Trial Counsel
Robert Baker (Mass. Bar No. 654023)
    Assistant Regional Director
William Donahue (Mass Bar. No. 631229)
   Senior Counsel
Jennifer Cardello  (Mass. Bar No. 657253)
    Senior Counsel
Boston Regional Office
33 Arch Street, 24th Floor
Boston, MA  02110
(617) 573-8979  (Harper direct)
(617) 573-4590  (fax)
Harperr@sec.gov (Harper email)

Dated: June 1, 2021